SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONES ASSIGNED CALL NUMBERS 508-212-7701 AND 347-602-2427 | Case No. 7:20-mj-1149-RJ<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, John C. Little, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call numbers 508-212-7701 and 347-602-2427, with listed subscriber Liam Jan Montgomery COLLINS (the "Target Cell Phones"), whose service provider is Cingular Wireless, a company whose records are managed by AT&T and is headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408.

2. The Target Cell Phones are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

3. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

4. I am an "investigative or law enforcement officer of the United States" within the



meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered to conduct investigations of and to make arrests for offenses enumerated 18 U.S.C. § 2516.

5. I have been employed as a Special Agent with NCIS since September of 2015. From 2010 through September of 2015, I served as a Special Agent with the United States Department of State Diplomatic Security Service. I am currently assigned to the NCIS Counterintelligence/Counter Terrorism Unit (CI/CT), Camp Lejeune, North Carolina. As part of my duties as an NCIS agent, I investigate federal crimes, including crimes pertaining to the wrongful sale and/or distribution of firearms. Throughout my career, I have utilized the electronic interception of telephonic communications and the use of Global Positioning Systems ("GPS") to supplement physical surveillance in federal investigations.

6. I have also spoken on numerous occasions with informants, suspects, and experienced investigators concerning the manner, means, methods, and practices that firearms traffickers use to further the operation of their organizations and the most effective methods of investigating and dismantling such organizations.

7. I know, based upon my training and experience, that individuals involved in illegal firearms trafficking organizations routinely utilize a number of operational techniques. These practices are designed and implemented to achieve two goals: first, the successful facilitation of the illegal activities, which consists of the illegal transportation and distribution of firearms and the subsequent collection of the proceeds of that illegal activity; and second, minimizing the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

8. Because this affidavit is being submitted for the limited purpose of obtaining a warrant to receive information regarding the location of the Target Cell Phones, it is not intended

2



to include each fact known to your affiant or to the Government. Your affiant has set forth only those facts necessary to support probable cause for the relief sought herein.

9. Based upon an investigation by Special Agents/Task Force Officers of the NCIS, FBI, and USPIS, which has included information provided by telephone records, the collection of information from confidential sources, controlled meetings, financial records, shipping records, and surveillance, your affiant states that there is probable cause to believe that (i) Liam Jan Montgomery Collins is engaged in the commission of violations of federal law, to wit: the conspiracy to the manufacture and trafficking of firearms and silencers in violation of 18 U.S.C. § 922(a), the NFA, 26 U.S.C. § 5801-72, and 18 U.S.C. § 371; (ii) the Target Cell Phones are being used to facilitate Collins's commission of those offenses; and (iii) the continued use and monitoring of the Target Cell Phones is needed in that relevant information as to the location of the Target Cell Phones and Collins will be obtained. Such information will likely provide additional evidence of a crime and/or lead to the discovery of contraband, fruits of a crime, or property intended for/used in the commission of the crimes listed above.

10. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a), the NFA, 26 U.S.C. § 5801-72, and 18 U.S.C. § 371 have been committed, are being committed, and will be committed by Collins and other individuals. There is also probable cause to believe that the location information described in Attachment B will

3



constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

12. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## STATUTORY AUTHORITY

13. 18 U.S.C. § 922(a)(1)(A) makes it unlawful "for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce."

14. 18 U.S.C. § 922(a)(5) makes it "unlawful for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides . . . ."

15. The National Firearms Act (NFA), 26 U.S.C. § 5801-72, is a taxing scheme that regulates the manufacture, sale, and transfer of certain types of "firearms" that Congress has deemed to be especially dangerous. The NFA definition of a "firearm" is narrower in scope that that found in Title 18; the NFA definition covers items such as silencers, short-barreled rifles, and machineguns (fully automatic firearms). 26 U.S.C. § 5845.

16. 26 U.S.C § 5861 proscribes certain acts related to NFA firearms, including:

4

(a) to engage in business as a manufacturer or importer of, or dealer in, firearms without having paid the special (occupational) tax required by section 5801 for his business or having registered as required by section 5802; or

(b) to receive or possess a firearm transferred to him in violation of the provisions of this chapter; or

(c) to receive or possess a firearm made in violation of the provisions of this chapter; or

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

(e) to transfer a firearm in violation of the provisions of this chapter; or

(f) to make a firearm in violation of the provisions of this chapter; or

(g) to obliterate, remove, change, or alter the serial number or other identification of a firearm required by this chapter; or

(h) to receive or possess a firearm having the serial number or other identification required by this chapter obliterated, removed, changed, or altered; or

(i) to receive or possess a firearm which is not identified by a serial number as required by this chapter; or

(j) to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter.

## PROBABLE CAUSE

17. On November 8, 2019, Newsweek published an article exposing U.S. Marine Lance Corporal Liam J. Collins as a member of the Iron March on-line forum. Various neo-Nazi groups to include the Attomwaffen Division utilized the Iron March forum as a communications platform and networking tool to organize and recruit for extremist organizations until the forum closed in late 2017. The Newsweek article focusing on Collins highlighted many of the racist comments he made on the forum after the forum

5



contents, to include private messages and posts, were made publicly available on the internet in 2019. Shortly after publication of the article, NCIS attempted to interview Collins regarding his use of the Iron March forum. Collins requested the presence of an attorney and declined to comment.

18. A review of posts and messages sent by Collins on Iron March revealed Collins was an avid recruiter for a group he described as "a modern day SS" that was located in the northeastern region of the United States. Collins began posting on Iron March in 2016. Collins frequently referenced his plan to join the Marines to gain combat experience and training that he could utilize within his own paramilitary group. In 2017, Collins described his group as a paramilitary unit that has members with previous and current military experience in the United States and Poland. Collins claimed his group held live fire training exercises and often expressed the importance of people within his movement gaining military experience. When Collins and others on Iron March attempted to meet in person or discuss matters that are more sensitive, they would often suggest the use of an encrypted messaging application that is associated with the user's cellular phone known as Wire. Collins joined the Marines in August of 2017 and is currently on active duty as an infantryman aboard Camp Lejeune, NC.

19. On April 14, 2020, NCIS developed a Cooperating Witness (CW) who reported Collins has discussed selling "illegal guns" in the past and is known to openly express racist ideology. The CW expressed to Collins that he/she planned to use Covid-19 stimulus money to purchase a Glock handgun from a store in Jacksonville, NC. Collins advised the CW that they should instead purchase a Glock 19 with no serial number and a silencer through an individual that Collins knows. Collins, after placing his phone in the

6



microwave, instructed the CW to only discuss this potential transaction in person or via Wire, the application frequently mentioned on Iron March. The CW continued to communicate with Collins via Wire regarding the purchase. The phone number the CW utilized to contact Collins is Target Cell Phone number 508-212-7701.

20. Collins advised the pistol and silencer would cost $1500.00 and stated that the advantage to purchasing a pistol and silencer in this manner is that the government will not know you have it, and you will avoid lengthy wait times for the proper tax stamp. When asked what brand silencer the CW would be receiving, Collins stated that there was no brand and it would be a drill pressed titanium/aluminum silencer. Your affiant believes Collins is indicating that an individual and not a known firearms manufacturer would manufacture the silencer for the CW. Collins told the CW he would assist the CW in attaching the silencer to the pistol when received and indicated it would be shipped from outside of the Camp Lejeune, NC area.

21. Collins also provided the CW a video of a pistol and working silencer being fired into the ground at an unidentified location by an individual with a very distinctive tattoo on their right forearm. The CW believes this is a pistol and silencer Collins personally owns and has referenced in the past. A tattoo visible in the video was utilized to identify the individual firing the weapon as Paul James Kryscuk. Collins additionally provided a screenshot of the Venmo account to which the money would be sent for the pistol and silencer. The account was saved as "@P-James, Paul Kryscuk James" under a contact card labeled as "Deacon" in the phone belonging to Collins. "Deacon" is believed to be a username utilized by Kryscuk on the Wire application.

22. On April 24, 2020, NCIS conducted a controlled meeting between the CW

7



and Collins. During the meeting, Collins stated that he has made multiple firearms deals with the individual who will be providing the pistol and silencer, completely trusts them, and has known them for years. Collins states he can get anything the CW wants to include short barrel rifles and fully automatic weapons from this individual. Collins also confirms his anti-Semitic and anti-African American views and portrays himself as an important part of a group whose identity he is not willing to divulge to the CW.

23. During the controlled meeting, the CW transferred $1500.00 in NCIS controlled funds via direct bank transfer to Collins in exchange for a Glock model 19 pistol with no serial numbers and a silencer. Collins informed the CW the pistol and silencer could take up to 6 weeks to arrive due to delays related to the Covid-19 pandemic.

24. During the controlled meeting and after the CW transferred the NCIS controlled funds to Collins, Collins utilized a direct bank transfer to send the money to another active duty Marine. That Marine then sent the money to Kryscuk via Venmo. Kryscuk transferred the money from his Venmo account to his personal bank account. Shortly after receiving the money, Kryscuk began making purchases from vendors known to sell devices called solvent traps that are easily modified using a drill press to make working silencers. The items available from these vendors are consistent with what is visible in the video provided to the CW by Collins of Kryscuk firing a pistol and silencer. Information provided by the United States Postal Inspection Service (USPIS) indicates Kryscuk received items from these vendors at his home located at 3897 S. Yorktown Way, Boise, ID on April 30, 2020. Surveillance also confirms this address as the location where Kryscuk maintains the Subject Vehicle.

25. Information discovered related to Internet Protocol (IP) addresses utilized

8

by Kryscuk indicate the IP address used to establish Kryscuk's Venmo account was also utilized to post on Iron March as user "Visions_From_Patmos." A review of posts made by this user show direct messages with "Niezgoda," the username utilized by Collins. In these messages from early 2017, Collins tells Kryscuk about his paramilitary group in the New Jersey area. Kryscuk expresses interest in meeting in person and Collins establishes alternate means of communication to continue away from the Iron March forum. Kryscuk, who moved to Boise, ID in January of 2020, has lived in New York the majority of his life and lived in close proximity to Collins at the time of these posts.

26. Additional review of Iron March posts made by Kryscuk revealed a manifesto style post that garnered attention on the forum in March of 2017. In the post, Kryscuk expresses the importance of colonizing and buying property in areas like the Pacific Northwest for whites, and emphasizes recruiting individuals with military experience to train National Socialist paramilitaries for use in a coming conflict with the United States. Kryscuk states these paramilitaries will be utilized in this conflict that he describes as a guerrilla style ground war he compares to the Iraq war.

27. Further review of financial information revealed previous transactions between Kryscuk, Collins, other individuals that have been linked to the Iron March Forum, and other military members in the Camp Lejeune, NC area that are consistent with the above described purchase made by the CW through Collins.

28. On June 9, 2020, NCIS, working with the USPIS, identified three packages sent from Boise, ID to Jacksonville, NC on June 8, 2020 that appeared consistent with previous shipments of suspected firearms or illegal items made by Kryscuk. The three packages were labeled " From: Shaun Corcoran, 1740 East Fairview Ave, #80, Meridian,

9



ID, To: "Ben McGough, 2075 N. Marine Blvd, U#135, Jacksonville, NC." Agents from the Boise, ID JTTF determined the name and address used as the return address for all three packages is a private mailbox setup by Kryscuk utilizing a fake driver's license and bank statement in the name of "Shaun Corcoran." The recipient on the package was found to be an active duty Marine serving in the same unit as Collins.

29. On June 10, 2020 a federal warrant to intercept and search the above mentioned packages was considered and approved by United States Magistrate Judge Robert Jones in the Eastern District of North Carolina. The packages were subsequently searched and found to contain what appears to be a complete 9mm pistol and a complete silencer. The pistol and silencer were broken down into the three packages in what appeared to be an attempt to avoid detection. The parts in in each package were ready to be quickly assembled without the use of any tools or specialized knowledge. The pistol and silencer do not have serial numbers and do not appear to be manufactured by a known firearms company.

30. On June 16, 2020, a second set of three packages with identical return and destination address information was identified. The packages were intercepted and searched pursuant to a federal warrant and found to contain what appears to be a complete 9mm pistol and silencer. The pistol and silencer are consistent with the previous pistol and silencer mentioned above.

31. Each set of three packages were intercepted, documented, and returned to the mail stream. NCIS then conducted surveillance that observed a Marine from the same unit as Collins retrieve each of the packages. One of the Marines was identified as Justin Hermanson. Hermanson has made a direct financial transaction with Kryscuk that is also

10

believed to be for an illegally manufactured pistol and silencer.

32. On June 17, 2020, Collins utilized Wire to direct the CW to meet with Hermanson in order to receive the pistol and silencer ordered through Kryscuk. NCIS and FBI JTTF Wilmington, NC conducted a controlled meeting between Hermanon and the CW. During the meeting Hermanson acknowledged the meeting was coordinated by Collins and told the CW he also had a similar pistol and silencer. The pistol and silencer provided to the CW were recovered and examined. The pistol and silencer were identified as the same items intercepted and documented on June 16, 2020. The pistol and silencer Hermanson stated he possesses are believed to be the pistol and silencer discovered subsequent to the June 10, 2020 search warrant.

33. Pen registration data indicates the Target Cell Phone numbers are currently in use by Collins at various times throughout the day. Collins appears to use Target Cell Phone number 347-602-2427 for most of his voice calls and Target Cell Phone number 508-212-7701 for most of his text communications. Collins has utilized Target Cell Phone number 347-602-2427 as his official contact information for his current Venmo and Navy Federal banking accounts. Collins has utilized and provided both Target Cell Phone numbers to the CW.

34. On July 6, 2020 and July 8, 2020, information provided by the USPIS indicates Kryscuk has continued to order parts from multiple manufacturers who make parts that are frequently altered to function as firearms silencers. Investigators believe it is likely that Kryscuk continues to manufacture silencers.

35. On July 7, 2020, database checks revealed Collins has purchased a plane ticket to travel to Boise, ID on July 10, 2020. Return flight information is not available at

11



this time. Investigators are not aware of previous travel to Boise, ID by Collins or any contacts Collins has in the area other than Kryscuk.

36. In reviewing the Venmo records described in paragraphs 21 through 25 above, it was determined an individual identified as Joseph Maurino had made transactions directly to Kryscuk. The amount of the transactions and purchase history of Kryscuk around the time of the transaction indicate the Venmo transactions were likely for silencers or other firearms related items produced by Kryscuk. Moreover, pen registration data shows recent direct communication between Collins and Maurino. Maurino is also a member of the New Jersey National Guard. Maurino has not been positively identified on the Iron March forum at this time; however, the above information indicates Maurino may be a member of the paramilitary group Collins frequently referenced on Iron March in 2017.[1] On July 8, 2020, database checks revealed Joseph Maurino has also purchased tickets to travel to Boise, ID on July 10, 2020 from Newark, NJ. Maurino has a return flight to Newark, NJ on July 14, 2020.

37. Due to the above information, investigators believe Collins has coordinated the illegal sale and transfer of illegal firearms manufactured by Kryscuk, who likely continues to manufacture these items in Boise, ID. Information discovered during the review of the Iron March Forum indicates Collins invited Kryscuk, who at the time lived near Collins in the New York/New Jersey area, to join a paramilitary group in the New Jersey area that Collins has described as a modern day SS in 2017. Kryscuk also made a

---

[1] Collins often described his paramilitary group to others on the Iron March forum as being comprised of members in the New Jersey area who are currently in the military or have prior military service.

12



manifesto style post in 2017 that advocated for colonizing and buying property in areas like the Pacific Northwest for whites to train National Socialist paramilitaries for use in a coming conflict with the United States. Kryscuk expressed the importance of individuals with military experience to be part of their movement. Kryscuk moved to Boise, ID in January or February of 2020 and is still in contact with Collins who appears to continue to hold beliefs consistent with those he posted on Iron March in 2017.

38. Investigators believe Collins intends to travel to Boise, ID on July 10, 2020 in order to meet with Kryscuk and Maurino. Location data from the Target Cell Phones will allow investigators to confirm where Collins travels while in Boise, ID, assist investigators with identifying who Collins is meeting with, and will likely yield additional investigative leads associated with this investigation.

39. In my training and experience, I have learned that Cingular Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. [Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These

13



towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

40. Based on my training and experience, I know that Cingular Wireless can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Cingular Wireless's network or with such other reference points as may be reasonably available.

41. Based on my training and experience, I know that Cingular Wireless can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Cingular Wireless typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

42. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

43. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to

14



delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

44. I further request that the Court direct Cingular Wireless to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Cingular Wireless. I also request that the Court direct Cingular Wireless to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Cingular Wireless's services, including by initiating a signal to determine the location of the Target Cell Phones on Cingular Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government

15



shall reasonably compensate Cingular Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

45. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Respectfully submitted,

John C. Little
Special Agent
NCIS

On this ____9th____ day of July, 2020, Special Agent John C. Little, appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Affidavit.

ROBERT B. JONES, JR.
UNITED STATES MAGISTRATE JUDGE

16



## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call numbers 508-212-7701 and 347-602-2427, (the "Target Cell Phones"), whose wireless service provider is Cingular Wireless, a company whose records are managed by AT&T and is headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408.

2. Records and information associated with the Target Cell Phones that is within the possession, custody, or control of Cingular Wireless.

## ATTACHMENT B

### Particular Things to be Seized

### I.     Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phones" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Cingular Wireless, Cingular Wireless is required to disclose the Location Information to the government. In addition, Cingular Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Cingular Wireless's services, including by initiating a signal to determine the location of the Target Cell Phone on Cingular Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Cingular Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 922(a)(1)(A); 18 U.S.C. § 922(a)(5); and 26 U.S.C. § 5801-72 involving Liam Collins, Paul Kryscuk, or unidentified subject(s).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

2